Philadelphia Bond and Mortgage Company v. Highland Crest Homes, Inc. (et al., Appellant).

Submitted September 17, 1974. Before WATKINS, P. J., JACOBS, HOFFMAN, CERCONE, PRICE, VAN DER VOORT, and SPAETH, JJ.

*Charles F. Mayer,* for appellant.

*Norman Ashton Klinger, William L. Matz,* and *Zoob & Matz,* for appellee.

OPINION BY CERCONE, J., June 24, 1975:

William Jules Sanft, hereinafter Jules Sanft, was President of Highland Crest Homes, Inc., hereinafter Highland. Highland wished to borrow money from Industrial Valley Bank and Trust Company, hereinafter IVB. It is unclear if this money was to be used personally by Jules Sanft or by Highland. IVB would not lend Highland the money unless Highland obtained a surety. Philadelphia Bond and Mortgage Company, hereinafter PBM, agreed to act as surety if Highland could get a credit-worthy co-maker on a judgment note to PBM. Sarah Sanft, Jules Sanft's mother, agreed to sign the note to PBM. The relevant parts of the note are as follows:

### JUDGMENT NOTE

$15,000.00 Philadelphia Pennsylvania March 1, 1968
City or Town          State        Date
One day [sic] after date, the undersigned (and if they be more than one, each of them jointly and severally) promise to pay, without defalcation to the order of:
  PHILADELPHIA BOND AND MORTGAGE COMPANY
Fifteen Thousand Dollars plus 8% per annum......
         Dollars ($15,000.00)
   The undersigned do hereby authorize . . . The undersigned and each endorser hereby waive presentment, demand, protest and notice of protest and non-payment.
        HIGHLAND CREST HOMES, INC.

/s/ ........................... (SEAL)
    William J. Sanft, President

/s/ ........................... (SEAL)
    Joy E. Sanft, Secretary

/s/ ........................ (SEAL)
     Sarah Sanft

This note is collateral for a note bearing even date and like amount in favor of INDUSTRIAL VALLEY BANK.

In September, 1969, Jules Sanft sold Highland to Morton G. Friedberg and his wife. The agreement of sale specifically made the IVB debt the responsibility of Jules Sanft. The Friedbergs sold Highland to Winifred B. Johnson who in turn sold it to James Hamilton, Inc., the present owner.

Subsequently Jules Sanft became delinquent in payment to IVB and in October, 1970, IVB made demand for payment upon PBM. In November, 1970, PBM paid IVB $13,519.09. PBM then made demand for payment from Sarah Sanft and Highland. Highland refused to pay because it contended the note was not a corporate debt but a personal debt of Jules Sanft individually. Sarah Sanft refused to pay because she contended that she was only a "surety" and that PBM should therefore be required to proceed against Highland before obtaining judgment against her. Judgment was thereafter entered against Highland and Sarah Sanft on the note.

Sarah Sanft petitioned the Court of Common Pleas of Philadelphia County to open the judgment and to exonerate her as the surety. The order of that court was as follows:

"Ordered that the Petition to Open Judgment, to Stay Execution and to Exonerate the Surety, is granted."

PBM then appealed to this court in 1971 contending that the judgment should not have been granted for Sarah Sanft and that the judgment should not have been opened. This court held that the lower court did not abuse its discretion in opening the judgment but did err in entering judgment in favor of Sarah Sanft. See *Philadelphia Bond and Mortgage Company v. Highland*

*Crest Homes, Inc.,* 221 Pa. Superior Ct. 89 (1972). In that previous appeal our court decided that there were two facts at issue which could only be resolved by trial proceedings. The first was whether there were facts present from which it could be determined that Sarah Sanft signed the note as a surety. The second was whether Highland had sufficient assets to make it worthwhile to attempt collection from Highland. Upon receiving further evidence the lower court then found that Sarah Sanft and Highland were co-makers and as such were both liable on the note.[1] Therefore, the lower court concluded that PBM could proceed against either party for payment on the judgment of the note.

Sarah Sanft has now appealed this lower court ruling contending first that she was a surety, and, secondly that where a surety gives notice to a creditor, as she did, to sue the principal debtor and the creditor fails to do so, even though the principal debtor has sufficient assets, the surety is discharged and exonerated. Therefore, the first question which we must now decide is whether Sarah Sanft was a surety. The Uniform Commercial Code[2] which controls this area of law has significantly changed the vocabulary and concepts of suretyship law. The word "surety" is a broad general classification which encompasses several sub-classes specifically defined under the Code. For example an "accommodation party" as defined by Section 3-415 is under the general classification of a

---

1. Appellee, PBM, attempts to raise an issue of its own which was not raised by the appellant concerning Highland's liability on the note. An appellee who files no counter-appeal cannot raise issues not raised by the appellant. *Swarb v. Lennox,* 405 U.S. 191, 201 (1971) ; *Philadelphia Tax Review Board v. Manheim Laundry Co.,* 398 Pa. 265 (1960) ; *Exner v. Gangewere,* 397 Pa. 58 (1959).

2. Act of April 6, 1953, P.L. 3, §§ 1-101 et seq., eff. July 1, 1954. Reenacted Act of October 2, 1959, P.L. 1023, §§ 1 et seq., eff. January 1, 1960. 12A P.S. §§ 1-101 et seq. Hereinafter referred to as the Code or simply referred to by section number only.

surety.[3] A "guarantor" as described by Section 3-416 is also a surety.[4] In fact, an endorser can also be considered a surety under the Code.[5] Each of these classes of sureties have different meanings and impose upon the "surety" different obligations and remedies. Therefore, to argue that one is a surety without further differentiation is, as will be seen, of little value.

Nevertheless we must still determine if Sarah Sanft is a surety because her second argument is based on that premise. On the face of the PBM note it appears that Sarah Sanft signed as a co-maker. The note states "the undersigned . . . jointly and severally promise to pay." In light of this language it seems that Sarah Sanft is making the contract of a maker as set forth in Section 3-413(1).[6] This conclusion is further supported by the following language found in the Comment to Section 3-402:

> "Thus by long established practice judicially noticed or otherwise established a signature in the lower right hand corner of an instrument indicates an intent to sign as the maker of a note or the drawer of a draft."

But simply because one appears to be a maker does not preclude that person from also being an accommodation

---

3. See Section 3-415, Comment 1, which states that an accommodation party is always a surety.

4. See Section 1-201(40) which states, " 'Surety' includes guarantor."

5. This is due to the fact that an "indorser makes the engagement of Section 3-414 that he will pay if the instrument to which he has subscribed is dishonored by its designated payor." [For example: the routine indorsement of a personal check.] Peters, *Suretyship Under Article 3 of the UCC*, 77 Yale L.J. 833, 837 (1968).

6. Section 3-413(1) states: "The maker or acceptor engages that he will pay the instrument according to its tenor at the time of his engagement or as completed pursuant to Section 3-115 on incomplete instruments."

party. Section 3-415(1) defines an accommodation party as follows:

"An accommodation party is one who signs the instrument in any capacity for the purpose of lending his name to another party to it."

While it is true that Sarah Sanft signed the note in the capacity of a co-maker it is also true that she signed her name for the purpose of lending her name to another party to it, namely Highland. Therefore, we can conclude that although Sarah Sanft is a co-maker she is also an accommodation party.[7] Because Sarah Sanft is an accommodation party she is therefore a surety. As Comment 1 to Section 3-415 clearly states: "Subsection (1) recognizes that an accommodation party is always a surety."

Having determined that Sarah Sanft is a surety we can now address her second issue which she frames as follows: "Where a surety gives notice to a creditor to sue the principal debtor and the creditor fails to do so, even though the principal debtor has sufficient assets, is not the surety discharged and exonerated?" As was stated above, the word "surety" is a broad general term which encompasses many concepts, i.e., accommodation party, guarantor, and indorser; and, because each of these concepts differs significantly, we must narrow the appellant's issue in order to fit the facts of this case. Since we have already determined that Sarah Sanft is an accommoda-

7.  The concept that one can be both a maker and an accommodation party is amply supported. Comment 1 to Section 3-415 uses the term "accommodation maker." J. White and R. Summers, *Handbook of the Law Under the Uniform Commercial Code* (1972) at 426 states: "It is common practice for a surety to appear on a note either as a co-maker or as an indorser." Peters, *Suretyship Under Article 3 of the UCC*, 77 Yale L.J. 833, 838 (1968) referring to Section 3-415(1) states: " 'In any capacity' means that an accommodator may sign as maker, drawer, acceptor or endorser, but the last words of the definition require that the accommodation act for a debtor who is himself on the instrument."

tion party the question then, is as follows: Where an accommodation party gives notice to a creditor to sue the principal debtor and the creditor fails to do so, even though the principal debtor has sufficient assets, is not the accommodation party discharged and exonerated? With the issue now properly framed we look to the Code for an answer. The logical place to begin is Part 6 of Article III of the Code which deals with discharge. After review of Part 6 of Article III it is clear that the type of discharge which Sarah Sanft seeks is not specifically provided for. In fact, nowhere in the Code is it provided that an accommodation party is discharged by giving notice to a creditor to sue the principal debtor. It is interesting to note, however, that similar relief (although not exactly that relief asked for by Sarah Sanft) is provided for under another type of surety classification, i.e., a guarantor set forth in Section 3-416(2) as follows:

> " 'Collection guaranteed' or equivalent words added to a signature mean that the signer engages that if the instrument is not paid when due he will pay it according to its tenor, but only after the holder has reduced his claim against the maker or acceptor to judgment and execution has been returned unsatisfied, or after the maker or acceptor has become insolvent or it is otherwise apparent that it is useless to proceed against him."

This relief would have been available to Sarah Sanft had she simply added the words "collection guaranteed" to her signature and thereby placed herself in the category of a Section 3-416(2) guarantor. Because these words were not used we can only assume that the parties to the note did not intend the procedure set forth in Section 3-416(2) to govern their agreement. It can now be seen why the question of whether Sarah Sanft was a "surety" was of little importance, because while she was in the general category of a surety, the type of relief she wanted (or at least similar relief) would only become available

to her if she can qualify as a guarantor under Section 3-416(2).

Because the specific relief desired by Sarah Sanft is not provided for in the Code is not to say that she is totally without any remedy. Section 3-415 which sets out the contract of an accommodation party gives Sarah Sanft the following remedy in subsection (5):

> "An accommodation party is not liable to the party accommodated, and if he pays the instrument has a right of recourse on the instrument against such party."

Therefore, if PBM elects to proceed against Sarah Sanft, and she pays on the instrument, she then has a right of recourse against Highland.

Having determined that the relief sought by Sarah Sanft is not provided for under the Code, we now turn to see if such relief can be found outside the Code. A short discussion of this area is necessary because such specific relief did exist under the early pre-Code doctrine of *Pain v. Packard*.[8] The doctrine of *Pain v. Packard* has been summarized as follows:

> "Concisely stated, the doctrine of *Pain v. Packard* is, that after the debt is due the surety may notify the creditor to sue the principal immediately, the penalty for noncompliance being the discharge of the surety, either absolutely or to the extent such noncompliance prejudiced him."[9]

Such doctrine was judicially adopted in this Commonwealth in the case of *Lichenthaler v. Thompson*, 13 S. & R. 157 (Pa. 1825). Since its adoption Pennsylvania courts have sporadically used the doctrine and in so doing have

---

8. The doctrine obtained its name from the case of *Pain v. Packard*, 13 Johns 174 (N.Y. 1816).

9. Comment, The Doctrine of Pain v. Packard, 37 Yale L.J. 971, 971-972 (1928). See also L. Simpson, *Handbook on the Law of Suretyship*, §42, at 173-180 (1950).

imposed certain requirements and limitations.[10] The question before us now is whether an accommodation party, as defined by Section 3-415 of the Code, can use this pre-Code doctrine. The argument can be made that the doctrine of *Pain v. Packard* was not displaced by the Code, but that in fact, it supplements the Code through Section 1-103.[11] This presents a novel question since there have been no Pennsylvania cases dealing with the doctrine of *Pain v. Packard* since the adoption of the Code. It must be kept in mind that in the instant case we need only decide whether this doctrine is available to an accommodation party. The question of whether other types of sureties under the Code can use this doctrine is not now before us. In any event, the doctrine can only stand to the extent that it is not inconsistent with the Code. *Pain v. Packard* states that after the debt is due the surety may notify the creditor to sue the principal immediately. This presupposes that a surety has the right to withhold payment until the creditor has first gone against the principal. Only a guarantor, as defined by Section 3-416(2), has the right to insist that collection first be attempted from the principal; an accommodation party, as defined by Section 3-415, does not. In the case of an accommodation party the creditor has the option of going against either the principal or the accommodation party. To the extent that *Pain v. Packard* required that collection first be attempted on the principal, we would in effect, by applying that doctrine, be giving an accom-

---

10. For those interested in the manner this doctrine has been used in Pennsylvania, see *Pennsylvania Annotations to the Restatement of Security*, §130, at 100-102 (1944).

11. Section 1-103 states as follows: "Unless displaced by the particular provisions of this Act, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions."

modation party a right which was intended only for a Section 3-416(2) guarantor. For this reason it is clear that an accommodation party, as defined by Section 3-415, cannot invoke the doctrine of *Pain v. Packard*. It is true that the doctrine did protect the accommodation party from losses resulting from the creditors unwillingness to bring suit or otherwise enforce against the principal a debt after default. But the protection the doctrine provided is not now necessary in that it is provided by Section 3-415(5).[12] Under this Section the accommodation party who is faced with a creditor who refuses to act may simply pay the debt himself and then begin collection proceedings against the principal based upon his statutorily provided right of recourse under Section 3-415 (5).[13]

Accordingly the order in favor of PBM against Sarah Sanft is affirmed.

JACOBS, J., concurs in the result.

––––––

CONCURRING OPINION BY SPAETH, J.:

I agree with the conclusion of the majority but believe it may be reached somewhat more directly.

The face of the note indicates that appellant is a comaker. She has signed "in the lower right hand corner." This "indicates an intent to sign as the maker of a note." 12A P.S. §3-402, Comment 1. Although nothing in appellant's signature suggests that she is an accommodation party, the trial court found that she is. I accept this finding, but it does not change appellant's liability. According to 12A P.S. §3-415(2). "the accommodation party

––––––

12. Section 3-415(5) states as follows: "An accommodation party is not liable to the party accommodated, and if he pays the instrument has a right of recourse on the instrument against such party."

13. See Section 3-415, Comment 5.

is liable in the capacity in which he has signed even though the taker knows of the accommodation." Comment 1 to §3-415 states that "[a]n accommodation maker or acceptor is bound on the instrument without any resort to his principal, while an accommodation indorser may be liable only after presentment, notice of dishonor and protest." Since appellant signed as a co-maker, appellee could recover from her without any resort to anyone else. As the majority states, once appellant has satisfied the debt, she may exercise her right of recourse against the accommodated party. 12A P.S. §3-415(5).